# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-203 (JDB)** |
| **v.** | : | |
| | : | |
| **ALEXANDER SHEPPARD,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, THREE, AND SIX OF THE INDICTMENT

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes defendant Alexander Sheppard's (hereinafter, "Sheppard" and the "defendant") Motion to Dismiss Counts One, Two, Three, and Six (hereinafter, the "Motion" or "Mot."), ECF 37.  Count One of the Indictment charges Sheppard with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Count Two charges Sheppard with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); Count Three charges Sheppard with disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2); and Count Six charges Sheppard with parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G).  ECF 8.

In his Motion, Sheppard asserts that the conduct alleged in Count One—*i.e.*, his corrupt obstruction, influencing, and impeding of Congress's certification of the Electoral College vote on January 6, 2021—falls outside the scope of § 1512(c)(2), either because his conduct was not prohibited by the statute or because the certification was not an "official proceeding."  Sheppard also argues that § 1512(c)(2) is unconstitutionally vague.

Next, Sheppard claims that Counts Two and Three, charging him unlawfully entering and remaining in a restricted building or grounds and disorderly conduct with a restricted building or grounds, must also be dismissed because the Capitol Police cannot designate a restricted area under the statute, and that even if they could, the statute is inapplicable since then-Vice President Michael Pence was not temporarily visiting the Capitol building.

Finally, Sheppard insists that Count Six should also be dismissed because 40 U.S.C. § 5104(e)(2)(G), which prohibits the willful and knowing parading, demonstrating, and picketing in any of the Capitol Buildings, is unconstitutionally vague on its face.

None of these arguments is availing, as this Court has already determined in other cases. *See United States v. Sean Michael McHugh*, 583 F.Supp.3d 1 (D.D.C. 2022) (JDB) (*McHugh I*); *United States v. Sean Michael McHugh*, 2022 WL 1302880 (D.D.C. May 2, 2022) (JDB) (*McHugh II*); and *United States v. Nassif*, 2022 WL 4130841 (Sept. 12, 2022) (JDB).  The Motion should therefore be denied in its entirety.

## FACTUAL BACKGROUND

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol at approximately 1:00 p.m. to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.  Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd that had gathered outside away from the Capitol building and the proceedings underway inside.

Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts. Shortly thereafter, at approximately 2:20 p.m.

members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

On or about December 30, 2020, Sheppard posted the following on Facebook: "Millions of us will be in Washington D.C. on January 6th to protest the RIGGED election and the acts of WAR that China committed on our country.  I'll see you there!"  Photographs on an Instagram placed Sheppard's location at Washington, D.C., along with a caption that read, "Not my president."

Sheppard traveled to Washington, D.C., and on January 6, 2021, he entered the Capitol building at approximately 2:15 p.m.  After entering into the Capitol, Sheppard quickly proceeded to the entrance of the Speaker's Lobby, where he was among the first to confront the officers guarding the doors while members of Congress were still being evacuated from the House Chamber.  The defendant used his cell phone to record video, through the glass panes in the Speaker's Lobby doors, of members and staff being evacuated.

The defendant also recorded video of himself inside the Capitol building on January 6, 2021, stating, "I'm here with some goddamn heroes, and we just shut down Congress, they called an emergency session, they said we're too scared . . . they've shut down Congress, let's fucking go!"

On January 19, 2021, an FBI Special Agent attempted to interview Sheppard at his home. He indicated that he desired to have counsel before answering any questions, but did state that he had driven from Powell, Ohio, to Washington, D.C., to protest the "rigged election."

## PROCEDURAL HISTORY

On March 12, 2021, the grand jury returned a six-count indictment charging Sheppard with one count of obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count One); one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); one count of disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); one count of entering and remaining in the floor of Congress, in violation of 40 U.S.C. § 5104(e)(2)(A) (Count Four); one count of disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); and one count of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Six). *See* ECF No. 8.

On October 21, 2022, Sheppard filed his motion to dismiss. *See* ECF 37.

## LEGAL STANDARD

An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense." *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). And an indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

4

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the government "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246-47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *United States v. Bailey*, 444 U.S. 394, 413, n.9 (1980) (motions for summary judgment are creatures of civil, not criminal trials); *Yakou*, 428 F.2d at 246-47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); *United States v. Oseguera Gonzalez*, No. 20-cr-40-BAH at *5, 2020 WL 6342940 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts of what the government can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016). Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination.

Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163 at *3 (D.D.C. May 25,

2022) (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed).

## **ARGUMENT**

I.      **Count One of the Indictment sets forth all the elements of 1512(c)(2) and adequately puts Sheppard on notice.**

Count One of the Indictment charges Sheppard with corruptly obstructing, influencing, or impeding an "official proceeding,"—*i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C. § 1512(c)(2).  Count One states:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **ALEXANDER SHEPPARD** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and engaging in disorderly and disruptive conduct.
>
> (**Obstruction of an Official Proceeding and Aiding and Abetting**, in violation of Title 18, United States Code, Sections 1512(c)(2) and 2)

Superseding Indictment at 1, ECF No. 8.

In 2002, Congress enacted Section 1512(c)'s prohibition on "[t]ampering with a record or otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745, 807.  Section 1512(c)'s prohibition applies to:

> [w]hoever corruptly--
>
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so*.

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official proceeding" to include "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  By the statute's plain terms, then, a person violates Section 1512(c)(2) when, acting with the requisite

*mens rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here, Congress's certification of the Electoral College vote.

Notwithstanding the plain terms of the offense, Sheppard advances three arguments in his motion to dismiss Count One of the indictment for failure to state an offense: (1) that the certification of the Electoral Count vote is not an official proceeding under 18 U.S.C. § 1512(c)(2); (2) that even if it were, 18 U.S.C. § 1512(c)(2) is unconstitutionally vague and vague as applied here; and (3) that Count One charges Sheppard with conduct not contemplated by 18 U.S.C. § 1512. Each of Sheppard's claims lack merit.

With respect to his challenges, numerous members of this Court considered, in other cases arising out of the events at the Capitol on January 6, 2021, one or more of the arguments Sheppard raises with respect to 18 U.S.C. § 1512(c)(2). *See, e.g., Bingert*, 2022 WL 1659163 at *2 n.3. Every district judge to have reached the issue, including this Court, has concluded that Congress's certification of the Electoral College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2). "In sum, the Court holds that the January 6th Certification was an 'official proceeding' for the purposes of 18 U.S.C. § 1512(c)(2)'s prohibition on 'corruptly . . . obstruct[ing], influencing, and imped[ing] any official proceeding.'" *United States v. Sean Michael McHugh*, 583 F.Supp.3d 1, 18 (D.D.C. 2022) ("*McHugh I*"). Likewise, district judges, including this Court, have consistently found that 18 U.S.C. § 1512(c)(2) is not unconstitutionally vague, *McHugh I* at 18-23, and consistently rejected as-applied arguments where, as here, the defendant is charged with "several other independently criminal acts in relation to their alleged obstruction." *McHugh I* at 23 (citing and quoting *United States v. Nordean*, 579 F.Supp.3d 28, 50-51 (D.D.C. 2021)). Finally, every reported court of appeals decision to have considered the scope of Section 1512(c)(2), and all but one of the judges of this Court to have considered the issue in cases

involving January 6, 2021, have concluded that Section 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence.  "[T]he Court again holds that 18 U.S.C. § 1512(c)(2) is not limited to obstructive acts taken with respect to a document or other object and instead applies broadly to all manner of obstructive conduct."  *United States v. Sean Michael McHugh*, 2022 WL 1302880, at *3 (D.D.C. May 2, 2022) ("*McHugh II*").

## A. The January 6th Certification was an "Official Proceeding" under Section 1512(c)(2).

### 1. The certification of the Electoral College vote is an official proceeding.

Sheppard argues that the Electoral College certification before Congress does not constitute an "official proceeding" under 18 U.S.C. 1512(c)(2).  Mot. at 7-10.  According to Sheppard, "an electoral count is simply not an adjudicative proceeding of the type that falls within the ambit of a witness tampering statute such as 18 U.S.C. § 1512(c)(2)."  Mot. at 8.  Sheppard also contends that an "'obstruction of an official proceeding before Congress' was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication."  *Id.* at 9.  This argument lacks merit and every member of this Court to have considered it has rejected it.  *See United States v. Bingert*, No. 21-cr-91, --- F. Supp. 3d ---, 2022 WL 1659163, at *4 (D.D.C. May 25, 2022) (Lamberth, J.) (citing cases).

### a. The plain text of the statute establishes that the Joint Session is an "official proceeding."

#### 1. Background

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote.  Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be

counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which Sheppard is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

U.S.C. § 1515(a)(1) (emphasis added).

## 2. The certification of the Electoral College vote is a proceeding before the Congress.

Simply put, the certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2).  That conclusion flows principally from the obstruction statute's plain text.  Skipping past the text, Sheppard argues that "the electoral count is clearly a ceremonial and administrative event," Mot. at 8, and "not an adjudicative proceeding."  Mot. at 10.   In *McHugh I*, the Court observed that "McHugh advance[d] several reasons to read 'official proceeding as requiring 'adjudicative responsibilities,' but they all fail. *McHugh I* at 15.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding."  *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013).  The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com).  Sheppard does not meaningfully discount that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly. Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies,

and proceedings "involving the business of insurance."  18 U.S.C. § 1515(a)(1); *see* S. Rep. No.

97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is

"defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs

§ 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification

qualifies.  This narrower definition includes the "business conducted by a court or other official

body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier

"official," the term proceeding thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d

at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense"

of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing

whether a law enforcement investigation amounts to an "official proceeding" as defined in § 1515

courts analyze the degree of formality involved in an investigation.  *See, e.g.*, *United States v.

Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding"

because that term "implies something more formal than a mere investigation"), *cert. denied*, 140

S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164,

169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons

was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*,

537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official

proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434

F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco,

and Firearms not an "official proceeding" because that term encompasses "events that are best

thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d

1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the

11

Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1 pm on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote is a "proceeding before the Congress."

*See* 18 U.S.C. § 1515(a)(1)(B).[1]

**B.  Section 1512(c)(2) Is Not Unconstitutionally Vague.**

Sheppard also contends that § 1512(c)(2) is unconstitutionally vague.  Mot. at 10-18.  His claim is without merit, as recognized every member of this Court to have considered the issue has rejected this argument.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'"  *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular

---

[1] In *McHugh I*, this Court determined that the January 6th Certification was not merely a proceeding of Congress, but was a "proceeding before the Congress," *McHugh I* at 14-15, because the Certification "sees Congress formally convene to hear, debate, and decide any disputes arising from the proceedings of a second entity," and was therefore not "a wholly internal proceeding" but rather one involving "a second entity as an integral component: the Electoral College." *Id.*

circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'"  *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  Likewise, "[t]hat each and every possible application of statutory language is not immediately apparent to a laymen does not make a statute void for vagueness, and a statutory term is not rendered unconstitutionally vague because it does not mean the same thing to all people, all the time, everywhere." *McHugh I* at 18 (internal citations and quotation omitted).  Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *United States v. Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Sheppard's inability to cite any legal authority in support of his "arbitrary application" argument, *see* Mot. at 14-15, demonstrates that he cannot overcome the "strong presumpti[on]" that § 1512(c)(2) is constitutional.  *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963).  Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *United States v. Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604.  Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *United States v. Williams*, 553 U.S. at 306.  The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does

undermine or interfere with a statutorily defined official proceeding.  While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).  Contrary to Sheppard's assertions, § 1512(c)(2) "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 575 F. Supp. 3d at 33).  It presents no vagueness concern nor invitation for arbitrary or wholly subjective application by either courts or juries.

### C. Section 1512(c)(2) Applies to All Manner of Obstructive Conduct, Not Just Actions Involving Documents, Records, and Other Objects

Sheppard, following *United States v. Garret Miller*, 589 F.Supp. 60 (D.D.C. 2022) (Nichols, J.), contends that his conduct falls outside of the scope of 18 U.S.C. § 1512(c)(2) because the statute requires that the defendant take "some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding."  Motion 18-21 (citing and quoting *Miller* at 28).  This argument also fails.

### 1. Section 1512(c)'s text, structure, and history confirm that § 1512(c)(2) is not limited to document-related obstructive conduct.

Contrary to Sheppard's assertions, 18 U.S.C. § 1512(c)(2) broadly prohibits conduct that intentionally and wrongfully obstructs official proceedings.  The ordinary meaning of "obstruct[], influence[], or impede[]" encompasses a range of conduct designed to frustrate an official proceeding. That conduct can include lying to a grand jury or in civil proceedings, exposing the identity of an undercover agent, or burning a building to conceal the bodies of murder victims.  It

also includes storming the Capitol to derail a congressional proceeding. A defendant who, acting

with the necessary *mens rea*, obstructs Congress's certification of the Electoral College vote,

commits a crime under Section 1512(c)(2).

> a. **A. Section 1512(c)'s text and structure confirm that Section 1512(c)(2) is not limited to document-related or witness-related obstructive conduct.**

Sheppard's argument that the Court should dismiss Count One because "the indictment

does not allege or imply that [he] took any action with respect to a document, record, or other

object in order to corruptly obstruct, impede or influence Congress's certification of the electoral

vote" is without merit.  Motion 20.  Section 1512(c)(2)'s plain text demonstrates that it prohibits

any corrupt conduct that intentionally obstructs or impedes an official proceeding.   When

interpreting a statute, courts look first to the statutory language, "giving the words used their

ordinary meaning."  *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks

omitted).  If the statutory language is plain and unambiguous, this Court's "inquiry begins with

the statutory text, and ends there as well."  *National Ass'n of Mfrs. v. Department of Defense*, 138

S. Ct. 617, 631 (2018) (internal quotation marks omitted).  Here, the meaning of "obstruct[],

influence[], or impede[]" is controlled by the ordinary meaning of those words.

The verbs Congress selected in § 1512(c)(2) are "noncontroversial."  *United States v.*

*Montgomery*, 578 F. Supp. 3d 54, 70 (D.D.C. 2021).  The words "obstruct" and "impede" naturally

"refer to anything that 'blocks,' 'makes difficult,' or 'hinders.'"  *Marinello v. United States*, 138

S. Ct. 1101, 1106 (2018) (brackets omitted) (citing dictionaries).  Similarly, "influence" includes

"affect[ing] the condition of" or "hav[ing] an effect on."  *Influence*, Oxford English Dictionary,

*available at* http://www.oed.com.  These verbs plainly apply to obstructive conduct that otherwise

might not fall within the definition of document or evidence destruction or witness tampering.  *See*

*United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013).  When read with § 1512(c)(2)'s subject ("whoever") and object ("any official proceeding"), those verbs prohibit a defendant "from coming in the way of, blocking, or holding up the business conducted by an official body, such as a court or the Congress, when that body has formally convened for the purpose of conducting that business." *Montgomery*, 578 F. Supp. 3d at 70.

Comparing the language in § 1512(c)(1) to that in § 1512(c)(2) confirms that the latter, unlike the former, is not a document-focused or witness-focused provision. Section 1512(c) consists of two provisions requiring Sheppard to act "corruptly."  Both contain a string of verbs followed by one or more direct objects. Section 1512(c)(1) applies to whoever corruptly "alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding."  The objects—"a record, document, or other object"—are static.  In contrast, § 1512(c)(2) applies to whoever corruptly "obstructs, influences, or impedes any official proceeding."  The object—"proceeding"—is dynamic, and the verbs that precede it are all intended to change the movement or course of that "proceeding."  They are verbs that do not apply to a fixed "record" or "document" or an inanimate "object."  The two sections are related through their connection to an official proceeding: § 1512(c)(1)'s verbs target forms of evidence tampering (*e.g.*, altering, destroying mutilating) directed at the documents, records, and objects that are used in official proceedings, while § 1512(c)(2)'s verbs take the proceeding itself as the object—thus prohibiting whatever conduct blocks or interferes with that proceeding without regard to whether that conduct involved documentary or tangible evidence.

Importing into § 1512(c)(2) a nexus-to-documents-or-witnesses requirement would not only require inserting an extratextual gloss, *see Dean v. United States*, 556 U.S. 568, 572 (2009)

(courts "ordinarily resist reading words or elements into a statute that do not appear on its face") (internal quotation marks omitted), it would also render the verbs in § 1512(c)(2) inapt. The *actus reus* that the verbs in § 1512(c)(2) encompass is obstructing, influencing, and impeding. But "[h]ow [could] anyone [] alter, destroy, mutilate or conceal an 'official proceeding' or how [could] anyone [] 'obstruct[], influence[], or impede[]' 'a record, document, or other object'?" *Montgomery*, 578 F. Supp. 3d at 75; *accord United States v. Fitzsimons*, 21-cr-158 (RC), 2022 WL 1698063, at *12 (D.D.C. May 26, 2022); *cf. Yates v. United States*, 574 U.S. 528, 551 (2015) (Alito, J., concurring) (rejecting interpretation of "tangible object" in § 1519 that would include a fish in part because of a mismatch between that potential object and the statutory verbs: "How does one make a false entry in a fish?"); *id.* at 544 (plurality opinion) ("It would be unnatural, for example, to describe a killer's act of wiping his fingerprints from a gun as 'falsifying' the murder weapon."). Such a mismatch is even more unlikely given how readily Congress could have drafted language that supplies a nexus to documents in § 1512(c)(2). *See Montgomery*, 578 F. Supp. 3d at 73 (Congress could have enacted a prohibition that covers anyone who "'engages in conduct that otherwise impairs the integrity or availability of evidence or testimony for use in an official proceeding'").

The resemblance between the operative verbs in Section 1512(c)(2) and those Congress enacted in two other obstruction provisions, 18 U.S.C. §§ 1503(a) and 1505, demonstrates that § 1512(c)(2) was designed to reach conduct beyond that relating to documents or witnesses. Congress drafted the "omnibus clause" in § 1503(a), which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due administration of justice," to serve as a "catchall provision," *United States v. Aguilar*, 515 U.S. 593, 599 (1995), that criminalizes obstructive conduct that falls outside the narrower prohibitions within § 1503(a) and neighboring provisions.

*See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 168-70 (3d Cir. 2013) (removing gold coins from safe-deposit box); *United States v. Frank*, 354 F.3d 910, 916-19 (8th Cir. 2004) (removing car to avoid seizure); *United States v. Lefkowitz*, 125 F.3d 608, 619-20 (8th Cir. 1997) (instructing employee to remove documents from a house); *United States v. Lester*, 749 F.2d 1288, 1295 (9th Cir. 1984) (hiding a witness); *United States v. Brown*, 688 F.2d 596, 597-98 (9th Cir. 1982) (warning suspect about impending search warrant to prevent discovery of heroin). Section 1505, which prohibits "corruptly . . . influenc[ing], obstruct[ing], or imped[ing] . . . the due and proper administration of the law under which any pending proceeding is being had," has been construed to have a similar scope. *See, e.g.*, *United States v. Vastardis*, 19 F. 4th 573, 587 (3d Cir. 2021) (manipulating an oil content meter to produce an inaccurate reading during a Coast Guard inspection and making a related false statement). Like § 1512(c)(2), Sections 1503(a) and 1505 do not include "any limitation on the nature of the obstructive act other than that it must be committed 'corruptly,'" which "gives rise to 'a fair inference' that 'Congress intended [§ 1512(c)(2)] to have a [broad scope].'" *McHugh*, 2022 WL 1302880, at *10 (quoting *United States v. Garret Miller*, 589 F.Supp. 60, 76 (D.D.C. 2022).

Consistent with the interpretation that obstructive behavior may violate Section 1512(c)(2) even where Sheppard did not "take[] some action with respect to a document," *Miller* at 78, or a witness, courts of appeals have upheld convictions under § 1512(c)(2) for defendants who lied in written responses to civil interrogatory questions about past misconduct while a police officer, *Burge*, 711 F.3d at 808-09; testified falsely before a grand jury, *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009); solicited information about a grand jury investigation from corrupt "local police officers," *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014); and burned an apartment to conceal the bodies of two murder victims, *United States v. Cervantes*, No. 16-10508,

2021 WL 2666684, at *6 (9th Cir. June 29, 2021) (unpublished); *see also United States v. Martinez*, 862 F.3d 223, 238 (2d Cir. 2017) (police officer tipped off suspects before issuance or execution of search warrants), *vacated on other grounds*, 139 S. Ct. 2772 (2019); *United States v. Ahrensfield*, 698 F.3d 1310, 1324-26 (10th Cir. 2012) (law enforcement officer disclosed existence of undercover investigation to target).

Interpreted correctly, § 1512(c)(2) applies to Sheppard's conduct, which involved trespassing into the restricted Capitol area and confronting law enforcement officers guarding the Speaker's Lobby for the purpose of stopping the certification.  In so doing, Sheppard hindered and delayed an "official proceeding" before Congress.  *See* 18 U.S.C. § 1515(a)(1)(B). Because construing § 1512(c)(2) to reach such conduct would neither "frustrate Congress's clear intention" nor "yield patent absurdity," this Court's "obligation is to apply the statute as Congress wrote it." *Hubbard v. United States*, 514 U.S. 695, 703 (1995) (internal quotation marks omitted).

### b. The term "otherwise" reinforces that § 1512(c)(2) covers obstructive conduct "other" than the document destruction covered in Section 1512(c)(1).

Sheppard also relies on *Miller* to argues that the term "otherwise" in § 1512(c)(2) served to limit the scope of the statute to actions taken with respect to a document, record or other object. Motion 18-21.  This interpretation overlooks Section 1512(c)(2)'s verbs and focuses almost entirely on the term "otherwise." But that term, properly interpreted, does not support such a narrowed interpretation of § 1512(c)(2).

The term "otherwise" means "in another way" or "in any other way."  *Otherwise*, Oxford English Dictionary, *available at* http://www.oed.com.  Consistent with its ordinary meaning, the term "otherwise" conveys that Section 1512(c)(2) encompasses misconduct that threatens an official proceeding "beyond [the] simple document destruction" that § 1512(c)(1) proscribes.

*Burge*, 711 F.3d at 809; *United States v. Petruk*, 781 F.3d 438, 446-47 (8th Cir. 2015) (noting that "otherwise" in Section 1512(c)(2), understood to mean "in another manner" or "differently," implies that the obstruction prohibition applies "without regard to whether the action relates to documents or records") (internal quotation marks omitted); *United States v. Ring*, 628 F.Supp.2d 195, 224 n.17 (D.D.C. 2009) (noting that § 1512(c)(2) is "plainly separate and independent of" § 1512(c)(1), and declining to read "otherwise" in § 1512(c)(2) "as limited by § 1512(c)(1)'s separate and independent prohibition on evidence-tampering"); *see also Gooch v. United States*, 297 U.S. 124, 126-28 (1936) (characterizing "otherwise" as a "broad term" and holding that a statutory prohibition on kidnapping "'for ransom or reward or otherwise'" is not limited by the words "ransom" and "reward" to kidnappings for pecuniary benefit); *Collazos v. United States*, 368 F.3d 190, 200 (2d Cir. 2004) (construing "otherwise" in 28 U.S.C. § 2466(a)(1)(C) to reach beyond the "specific examples" listed in prior subsections, thereby covering the "myriad means that human ingenuity might devise to permit a person to avoid the jurisdiction of a court"). That reading follows inescapably from the text of § 1512(c)'s two subsections read together: § 1512(c)(1) "describes how a defendant can violate the statute by 'alter[ing], destroy[ing], mutilat[ing], or conceal[ing]' documents for use in an official proceeding," *Puma*, 2022 WL 823079, at *12, while "otherwise" in Section 1512(c)(2) "signals a shift in emphasis . . . from actions directed at evidence to actions directed at the official proceeding itself," *Montgomery*, 578 F. Supp. 3d at 72 (internal quotation marks omitted).

In this way, § 1512(c)(2) criminalizes the same *result* prohibited by § 1512(c)(1)—obstruction of an official proceeding—when that result is accomplished by a different means, *i.e.*, by conduct *other* than destruction of a document, record, or other object. *Cf. United States v. Howard*, 569 F.2d 1331, 1333 (5th Cir. 1978) (explaining that 18 U.S.C. § 1503(a), which

criminalizes the result of obstructing the due administration of justice, provides specific means of accomplishing that result and then a separate catchall clause designed to capture other means). Section 1512(c)(2), in other words, "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense involving documents or records under § 1512(c)(1).  *Petruk*, 781 F.3d at 447 (quoting *Volpendesto*, 746 F.3d at 286).

Contrary to defendant's suggestion that § 1512(c)(2) is untethered to § 1512(c)(1), "otherwise" as used in § 1512(c)(2) indicates that § 1512(c)(2) targets obstructive conduct in a manner "other" than the evidence tampering or document destruction that is covered in § 1512(c)(1).  That understanding of "otherwise" is fully consistent with any reasonable definition of the term and does not render the term "surplusage."

Sheppard also points to the *Miller* decision's reliance on *Begay v. United* States, 553 U.S. 137 (2008) to support his preferred interpretation that the language preceding "otherwise" limited the scope of the of the following clause.  Mot. 18.  That reliance is misplaced.  In considering whether driving under the influence was a "violent felony" for purposes of the Armed Career Criminal Act (ACCA)'s residual clause, which defines a "violent felony" as a felony that "is burglary, arson, or extortion, involves use of explosives, or *otherwise involves conduct that presents a serious potential risk of physical injury*," 18 U.S.C. § 924(e)(2)(B)(ii) (emphasis added), the Supreme Court in *Begay* addressed a statutory provision that has an entirely different structure than § 1512(c)(2).  *See United States v. Sandlin*, 575 F. Supp. 3d 16, 25 (D.D.C. 2021) (distinguishing *Begay* on the ground that, unlike the ACCA residual clause, the "otherwise" in § 1512(c)(2) is "set off by both a semicolon and a line break").  Unlike in the ACCA residual clause, the "otherwise" phrase in § 1512(c)(2) "stands alone, unaccompanied by any limiting examples."  *Ring*, 628 F.Supp.2d at 224 n.17.  In other words, the "key feature" in §

924(e)(2)(B)(ii) at issue in *Begay*, "namely, the four example crimes," 553 U.S. at 147, is "absent" in § 1512(c)(2).  *United States v. Caldwell*, 581 F. Supp. 3d 1, 24 (D.D.C. 2021), *reconsideration denied*, No. 21-CR-28 (APM), 2022 WL 203456 (D.D.C. Jan. 24, 2022).  Although Judge Nichols recognized the structural difference between the ACCA residual clause and § 1512(c)(2), *see Miller* at 71-72, he offered no reason to import *Begay*'s interpretation of "otherwise" to Section 1512(c)(2)'s differently structured provision.  As this Court recognized, "*Begay* cannot bear the weight Judge Nichols assigns to it—the similarities between § 924(e)(2)(B)(ii)  and § 1512(c) end with the use of the word 'otherwise' . . . This Court readily concedes that 'otherwise' *sometimes* means what Judge Nichols suggests—but that it does not have that meaning in § 1512(c)(2). . . . Instead, § 1512(c)'s structure suggests that paragraphs (c)(1) and (c)(2) are semantically independent."  *McHugh II* at *5.

In fact, § 1512(c)(2) is a poor fit for application of the *ejusdem generis* canon that *Begay* applied to the ACCA residual clause.  "Where a general term follows a list of specific terms, the rule of *ejusdem generis* limits the general term as referring only to items of the same category." *United States v. Espy*, 145 F.3d 1369, 1370–71 (D.C. Cir. 1998).  In *Yates*, for example, the plurality and concurring opinions applied the *ejusdem generis* canon to interpret the word "tangible object" in 18 U.S.C. § 1519, which makes it a crime to "knowingly alter[], destroy[], mutilate[], conceal[], cover[] up, falsif[y], or make[] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence" an investigation.  *See* 574 U.S. at 545-56 (plurality opinion); *id.* at 549-50 (Alito, J., concurring).  But § 1512(c)'s structure differs significantly: it includes one numbered provision that prohibits evidence-tampering, followed by a semi-colon, the disjunctive "or," and then a separately numbered provision containing the separate catchall obstruction prohibition. "The absence of a list of specific items undercuts the

inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Furthermore, in the same way that the *ejusdem generis* canon does not apply to the omnibus clause in § 1503 that is "one of . . . several distinct and independent prohibitions" rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable," *Aguilar*, 515 U.S. at 615 (Scalia, J., concurring in part and dissenting in part), it has no application to § 1512(c)(2), which embodies the same structure. *Cf. Loughrin v. United States*, 573 U.S. 351, 359 (2014) (distinguishing the mail fraud statute (18 U.S.C. § 1341), which "contains two phrases strung together in a single, unbroken sentence," from the bank fraud statute (18 U.S.C. § 1344), which comprises "two clauses" with "separate numbers, line breaks before, between, and after them, and equivalent indentation—thus placing the clauses visually on an equal footing and indicating that they have separate meanings"); *see also McHugh*, 2022 WL 1302880, at *5 (explaining that the *ejusdem generis* canon on which the *Miller* court relied is "irrelevant" because rather than the "'A, B, C, or otherwise D'" structure found in the ACCA residual clause, § 1512(c) "follows the form '(1) A, B, C, or D; or (2) otherwise E, F, or G'").

Moreover, *Begay* noted first that the "listed examples" in § 924(e)(2)(B)(ii)—burglary, arson, extortion, or crimes involving explosives—indicated that the ACCA residual clause covered only similar crimes. *Begay*, 553 U.S. at 142. Those examples, the majority reasoned, demonstrated that § 924(e)(2)(B)(ii) was not designed "to be all encompassing," but instead to cover only "crimes that are roughly similar, in kind as well as in degree of risk posed, to the examples themselves." *Id.* at 142-43. The majority next drew support for its conclusion from § 924(e)(2)(B)(ii)'s history, which showed that Congress both opted for the specific examples in lieu of a "broad proposal" that would have covered offenses involving the substantial use of

physical force and described § 924(e)(2)(B)(ii) as intending to encompass crimes "similar" to the examples. *Id.* at 143-44. In the final paragraph of that section of the opinion, the majority addressed "otherwise," noting that the majority "[could ]not agree" with the government's argument that "otherwise" is "*sufficient* to demonstrate that the examples do not limit the scope of the clause" because "the word 'otherwise' *can* (we do not say *must* . . .) refer to a crime that is similar to the listed examples in some respects but different in others." *Id.* at 144.

The majority's "remarkably agnostic" discussion of "otherwise" in *Begay*, which explicitly noted that the word may carry a different meaning where (as here) the statutory text and context indicates otherwise, *Montgomery*, 578 F. Supp. 3d at 69-72, suggests, if anything, that "*the government's* interpretation of 'otherwise' [in Section 1512(c)(2)] is the word's more natural reading," *McHugh*, 2022 WL 1302880, at *5 n.9; *see also Caldwell*, 581 F. Supp. 3d at 24 (declining to depart from the "natural reading" of "otherwise" to mean "'in a different way or manner'" based on the discussion in *Begay*). In short, the majority in *Begay* "placed little or no weight on the word 'otherwise' in resolving the case." *Montgomery*, 578 F. Supp. 3d at 71.

Whatever the significance of the majority's interpretation of "otherwise" in *Begay*, *Begay*'s holding and the subsequent interpretation of the ACCA residual clause demonstrate the central flaw with imposing an extratextual requirement within § 1512(c)(2). The Supreme Court held in *Begay* that Section 924(e)(2)(B)(ii) encompasses only crimes that, similar to the listed examples, involve "purposeful, 'violent,' and 'aggressive' conduct." 553 U.S. at 144-45. But "*Begay* did not succeed in bringing clarity to the meaning of the residual clause." *Johnson v. United States*, 576 U.S. 591, 600 (2015). Just as the *Begay* majority "engraft[ed]" the "purposeful, violent, and aggressive conduct" requirement onto the ACCA's residual clause, 553 U.S. at 150 (Scalia, J., concurring in judgment) (internal quotation marks omitted), so too would Defendant Sheppard's

proposed interpretation engraft onto § 1512(c)(2) the requirement that a defendant "have taken some action with respect to a document, record, or other object" to obstruct an official proceeding. In the nearly 20 years since Congress enacted § 1512(c)(2), no reported cases have adopted that interpretation, and for good reason.  That interpretation would give rise to unnecessarily complex questions about what sort of conduct qualifies as "tak[ing] some action with respect to a document" in order to obstruct an official proceeding.  *Cf. United States v. Singleton*, No. 06-cr-80, 2006 WL 1984467, at *3 (S.D. Tex. July 14, 2006) (unpublished) (concluding that § 1512(c)(2) "require[s] some nexus to tangible evidence, though not necessarily tangible evidence already in existence"); *see also United States v. Hutcherson*, No. 05-cr-39, 2006 WL 270019, at *2 (W.D. Va. Feb. 3, 2006) (unpublished) (concluding that a violation of § 1512(c)(2) requires proof that "an individual corruptly obstructs an official proceeding[] through his conduct in relation to a tangible object").[2] In brief, defendant's interpretation is likely to give rise to the very ambiguity it purports to avoid.

### c.  Tools of statutory interpretation do not support the Miller Court's narrowed interpretation.

Sheppard asserts that Judge Nichols' decision in *Miller* "equally applies to Mr. Sheppard's case.'"  Mot. at 18.  But *Miller* was wrongly decided, and § 1512(c)(2) is "not limited by subsection (c)(1)—which refers to 'alter[ing], destroy[ing], mutilat[ing] or conceal[ing] a record, document, or other object' specifically."  *United States v. Robertson*, 2022 WL 2438546, *3 (D.D.C. July 5,

---

[2] The defendant's interpretation of § 1512(c)(2) resembles the reading given in *Singleton* and *Hutcherson*, both of which are unpublished. As noted in the main text, no other court, at least in a reported opinion, appears to have adopted the nexus-to-tangible-evidence-or-a-tangible-object standard articulated in *Singleton* and *Hutcherson*. *See United States v. De Bruhl-Daniels*, 491 F.Supp.3d 237, 250-51 (S.D. Tex. 2020) (identifying *Singleton* and *Hutcherson* as outliers from the "most popular—and increasingly prevalent—interpretation of § 1512(c)(2) [as] an unlimited prohibition on obstructive behavior that extends beyond merely tampering with tangible items"); *Ring*, 628 F.Supp.2d at 225 n.18 (disagreeing with *Singleton* and *Hutcherson* but finding that the alleged conduct at issue in that case involved "some nexus to documents"). No court of appeals has cited either case.

2022). Indeed, contrary to Sheppard's assertions and the conclusions reached in *Miller*, the tools of statutory construction *reinforce* the conclusion that § 1512(c)(2) reaches conduct that obstructs or impedes an official proceeding in a manner other than through document destruction or evidence tampering.

Section 1512 is comprised of two parts: four subsections that define criminal offenses (§§ 1512(a)–(d)), followed by six subsections that provide generally applicable definitions and clarifications (§§1512(e)–(j)).[3]  Within the first part, three subsections (§§ 1512(a)–(c)) define criminal offenses with statutory maxima of at least 20 years, *see* §§ 1512(a)(3), (b)(3), (c), while § 1512(d) carries a three-year statutory maximum, § 1512(d). Within that structure, Congress sensibly placed § 1512(c)(2) at the very end of the most serious—as measured by statutory maximum sentences—obstruction offenses, precisely where a "catchall" for obstructive conduct not covered by the more specific preceding provisions would be expected. In any event, the "mousehole" canon—to which *Miller* refers—provides that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions," *Whitman*, 531 U.S. at 468, but it "has no relevance" where, as here, the statute in question was written in "broad terms," *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1753 (2020).

To that point, Sheppard's concern that a reading of § 1512(c)(2) encompassing obstructive conduct unrelated to documents, evidence, or witnesses sweeps too broadly is unfounded.  Overlap is "not uncommon in criminal statutes," *Loughrin*, 573 U.S. at 358 n.4, and § 1512(c)(2)'s broader language effectuates its design as a backstop in the same way that a "generally phrased residual clause . . . serves as a catchall for matters not specifically contemplated."  *Republic of Iraq v.*

---

[3] Section 1512 also includes one subsection, placed at the end, that adds a conspiracy offense applicable to any of the substantive offenses set out in §§ 1512(a)–(d).  18 U.S.C. § 1512(k).

*Beaty*, 556 U.S. 848, 860 (2009). Moreover, the "mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." *Pasquantino v. United States*, 544 U.S. 349, 358 n.4 (2005).

Any overlap between § 1512(c)(2) and other provisions in § 1512 has a "simple" explanation that does not warrant the Court's narrowing construction. *McHugh*, 2022 WL 1302880, at *8. When Congress enacted the "direct obstruction" provision in § 1512(c)(2), that provision necessarily included the "indirect obstruction prohibited" in the rest of § 1512. *Id.* Congress in § 1512(c)(2) therefore did not "*duplicate* pre-existing provisions . . . but instead *expanded* the statute to include additional forms of obstructive conduct, necessarily creating overlap with the section's other, narrower prohibitions." *Id.* Congress was not required to repeal those pre-existing prohibitions and rewrite § 1512 "to create a single, blanket obstruction offense" just to avoid overlap. *Id.* at *9. "Redundancies across statutes are not unusual events in drafting," *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992), and the "rule[] of thumb" that statutes should be interpreted to avoid superfluity necessarily yields to the "cardinal canon" that Congress "says in a statute what it means and means in a statute what it says there," *id.* at 253-54. In other words, § 1512(c)(2) "creates only explicable and indeed inevitable overlap rather than outright redundancy," such that the "purported superfluity" in § 1512 "simply does not justify displacing the provision's ordinary meaning." *McHugh*, 2022 WL 1302880, at *10. That is particularly so here because even a "broad interpretation of § 1512(c)(2) does not entirely subsume numerous provisions within the chapter," and any overlap with other provisions in § 1512 is "hardly remarkable." *Sandlin*, 575 F. Supp. 3d at 27; *accord United States v. Nordean*, 579 F. Supp. 3d 28 (D.D.C. 2021).

Notably, Sheppard's interpretation injects a more troubling type of superfluity. Construing

§ 1512(c)(2) to require some action with respect to a document, for example, risks rendering § 1512(c)(2) itself superfluous considering the "broad ban on evidence-spoliation" in § 1512(c)(1). *Yates*, 574 U.S. at 541 n.4 (plurality opinion) (internal quotation marks omitted); *cf. United States v. Poindexter*, 951 F.2d 369, 385 (D.C. Cir. 1991) (explaining that limiting the catchall provision in § 1503(a)'s omnibus clause to obstructive acts "directed against individuals" would render the omnibus clause superfluous because "earlier, specific[] prohibitions" in § 1503(a) "pretty well exhaust such possibilities") (internal quotation marks omitted). The canon against surplusage is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). It is even stronger here, where it would render superfluous "other provisions in the *same enactment*"—namely, the Sarbanes-Oxley Act. *Freytag v. Comm'r*, 501 U.S. 868, 877 (1991) (emphasis added; internal quotation marks omitted). At a minimum, the canon does not militate in favor of Defendant Sheppard's reading. *See United States v. Ali*, 718 F.3d 929, 938 (D.C. Cir. 2013) (canon against surplusage "'merely favors that interpretation which avoids surplusage,' not the construction substituting one instance of superfluous language for another").

Finally, an interpretation of § 1512(c)(2) that imposes criminal liability only when an individual takes direct action "with respect to a document, record, or other object" to obstruct a qualifying proceeding leads to absurd results. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 69 (1994) (rejecting interpretation of a criminal statute that would "produce results that were not merely odd, but positively absurd"). That interpretation would appear, for example, not to encompass an individual who seeks to "obstruct[], influence[], or impede[]" a congressional proceeding by illegally entering into the Capitol while legislators sought to perform their constitutional and statutory duties to certify the Electoral College vote results, racing to the

entrance of the Speaker's Lobby, confronting officers guarding the door there, and recording himself inside the Capitol proclaiming, "I'm here with some goddamn heroes, and we just shut down Congress, they called an emergency session, they said we're too scared . . . they've shut down Congress, let's fucking go!"   The statutory text does not require such a counterintuitive result.

In short, if Congress in § 1512(c)(2) endeavored to create the narrow document-focused provision that the Court envisioned, it "did a particularly poor job of drafting" because Congress would have "effectuated [its] intent in a way that is singularly susceptible to misinterpretation, as evidenced by the overwhelming majority of judges who have construed § 1512(c)(2) broadly." *McHugh*, 2022 WL 1302880, at *11.   Likewise, the Court should reject Sheppard's atextual, narrowed interpretation.

### d. Legislative history does not support Sheppard's narrow interpretation of § 1512(c)(2).

Defendant Sheppard also contends that the history of the enactment of the Sarbanes-Oxley Act supports his narrow view of § 1512(c)(2).  Again, Defendant Sheppard's argument fails.  As a threshold matter, because "the statutory language provides a clear answer," the construction of § 1512(c)(2) "ends there," and resort to legislative history is unnecessary.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999).   Nevertheless, the legislative history of § 1512(c)(2)— particularly when considered alongside the history of § 1512 more generally—does not support Sheppard's interpretation of § 1512(c)(2) for two reasons.

First, § 1512(c) aimed at closing a "loophole" in § 1512: the existing prohibitions did not adequately cover a defendant's *personal* obstructive conduct *not* aimed at another person.  *See* 148 Cong. Rec. S6550 (statement of Sen. Hatch).   To close that loophole, § 1512(c)(1) criminalizes a defendant's firsthand destruction of evidence (without having to prove that

Sheppard induced another person to destroy evidence) in relation to an official proceeding, and § 1512(c)(2) criminalizes a defendant's firsthand obstructive conduct that *otherwise* impedes or influences an official proceeding (though not necessarily through another person).  *See Burge*, 711 F.3d at 809–10.  Sheppard's limiting construction undermines Congress's efforts at loophole closing.

Second, no substantive inference reasonably draws from the fact that the title of § 1512 does not precisely match the "broad proscription" it in fact contains, given that the Sarbanes-Oxley Act unequivocally and broadly entitled the new provisions now codified in § 1512(c), "Tampering with a record *or* otherwise impeding an official proceeding."  Pub. L. No. 107-204, § 1102, 116 Stat. 807 (emphasis added; capitalization altered).  Section 1512's title is more limited simply because Congress did not amend the pre-existing title when it added the two prohibitions in § 1512(c) in 2002. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947) (describing "the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text").

And while the legislators who enacted § 1512(c) in the Sarbanes-Oxley Act undoubtedly had document shredding foremost in mind, "it is unlikely that Congress was concerned with only the type of document destruction at issue in the *Arthur Andersen* case." *Montgomery*, 578 F. Supp. 3d at 77 (referencing *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005)).  In other words, "there is no reason to believe that Congress intended to fix that problem only with respect to 'the availability or integrity of evidence.'" *Id.*  In addition, if Sheppard's narrow interpretation were correct, then certain floor statements, such as Senator Hatch's description of Section 1512(c)'s purpose to strengthen an obstruction offense "often used to prosecute document shredding *and*

*other forms of obstruction of justice*," 148 Cong. Rec. S6550 (emphasis added), "would be quite strange." *McHugh*, 2022 WL 1302880, at *12.

> ### e.  Even if Section 1512(c)(2) required that the obstructive act relate to documentary evidence, Sheppard's conduct would be covered.

Neither ordinary methods of statutory construction nor the rule of lenity supports limiting § 1512(c)(2) to document-based obstructive conduct.  But even if § 1512(c)(2) were so limited, it necessarily reaches beyond the direct evidence tampering already covered by § 1512(c)(1) to include alternative ways of interfering with the consideration of documentary evidence—as happened here when Sheppard impeded lawmakers' consideration of documents and records at the Electoral College vote certification proceeding.

At a minimum, § 1512(c)(2) covers conduct that prevents the examination of documents, records, and other nontestimonial evidence in connection with an official proceeding.  Even assuming a focus on documentary evidence, the additional conduct that it would cover beyond § 1512(c)(1) would include, for example, corruptly blocking the vehicle carrying the Electoral College vote certificates to the Capitol for congressional examination at the certification proceeding, which would not "alter[], destroy[], mutilate[], or conceal[]" that evidence under 1512(c)(1), but would plainly "obstruct[]" or "impede[]" the proceeding with respect to that evidence under § 1512(c)(2).  For similar reasons, § 1512(c)(2) would likewise cover blocking a bus carrying lawmakers to the Capitol to examine the certificates at the certification proceeding. And it just as readily covers displacing lawmakers from the House and Senate Chambers, including continuing the riot which has displaced them, where they would examine and discuss those certificates and other records.

The Electoral College vote certification is rooted in constitutional and federal statutory law that requires the creation and consideration of various documents, and that certification operates

through a deliberate and legally prescribed assessment of ballots, lists, certificates, and, potentially, written objections.  Had Sheppard sought to alter or destroy any of those documents, he would have violated Section 1512(c)(1).  Here, Sheppard allegedly sought to stop Members of Congress from reviewing those constitutionally and statutorily mandated documents at a proceeding to certify the results of the 2020 presidential election.  Therefore, even if a violation of § 1512(c)(2) covered only obstructive behavior that prevents the consideration of documents, records, or other objects at an official proceeding, Sheppard's alleged conduct—corruptly obstructing and impeding the examination of physical or documentary evidence at a congressional proceeding—nevertheless states an offense.

## II.   Counts Two and Three the Indictment set forth all the elements of 1752.

### A.   Section 1752 makes no mention of which official entity can restrict entry into areas covered by the statute, much less require that only the secret service can do so

The text of § 1752 provides, in pertinent part that:

(a) Whoever--

> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;
> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

\* \* \* \*

(5) \* \* \* \*shall be punished as provided in subsection (b).

As Judge Friedman has recognized: "[t]he text of Section 1752 'is not complex,' and it 'plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area.'" *United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at \*29 (D.D.C. Mar. 19, 2022)

((quoting *United States v. Griffin*, 2021 WL 2778557 at *3 and *United States v. Mostofsky*, 2021 WL 6049891, at *13, respectively).

Section 1752(c)(1) provides three alternate definitions for the term "restricted buildings and grounds."

> (c) In this section—
>
>> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>>
>>> (A)   of the White House or its grounds, or the Vice President's official residence or its grounds;
>>>
>>> (B)   of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>>>
>>> (C)   of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and
>>
>> (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752(c).

The definition that applies here is § 1752(c)(1)(B), "any posted, cordoned off, or otherwise restricted area ... of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." "Person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. *See* § 1752(c)(2); 18 U.S.C. § 3056(a)(1) ("Under the direction of the Secretary of Homeland Security, the United States Secret Service is authorized to protect the … the Vice President"). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, "knowingly and unlawfully entering or remaining … without lawful authority to do so," § 1752(a)(1) (Count 2), and "knowingly and with intent to

impede or disrupt … government business," engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2) (Count 3).

This Court should decline the defendant's request to import an extra-textual requirement that the Secret Service is the only entity that can restrict an area under § 1752.  As Judge McFadden concluded in rejecting that precise argument "[t]hese extratextual arguments are unavailing." *United States v. Couy Griffin*, No. 21-CR-00092 (TNM), 549 F. Supp. 3d 49, 2021 WL 2778557, at \*4 (D.D.C. July 2, 2021).  If § 1752 is "'directed to' anyone—a dubious claim—it would seem directed at prosecutors, would-be violators, and courts; it is not a regulatory statute." *Id*. "More importantly, the Court will not invoke the statute's supposed purpose or legislative history to create ambiguity where none exists."  *Id*.  "If Congress intended a statute designed to safeguard the President and other Secret Service protectees to hinge on who outlined the safety perimeter around the principal, surely it would have said so."  *Id*. at \*6. *See United States v. Thomas Edward Caldwell*, D.D.C. 21-cr-28 (APM), ECF 415 at p. 4 ("The court finds Judge McFadden's reasoning in *Griffin* persuasive and adopts it in full here."), and *McHugh I* at 30 ("This Court agrees with Judge McFadden's analysis and conclusion: an area does *not* need to be established by the U.S. Secret Service in order to qualify as a 'restricted building or grounds under § 1752(c)(1)").

Judge McFadden also explained why the legislative history on which defendant's argument principally relies undercuts his argument:

> From its enactment in 1970 until 2006, Section 1752 contained a provision that authorized the Treasury Department (of which, until 2003, the Secret Service was a component) to "designate by regulations the buildings and grounds which constitute the" protected residences or offices of Secret Service protectees and "prescribe regulations governing ingress or egress to ... posted, cordoned off, or otherwise restricted areas where" protectees were present. 18 U.S.C. § 1752(d) (1970)….
>
> By 2006 Congress rewrote the statute, in the process eliminating reference to the Treasury Department and to any "regulations" from any executive branch agency.

18 U.S.C. § 1752 (2006). More, the new statute criminalized merely entering or remaining in a restricted area; the old statute required further action, such as impeding government business, obstructing ingress or egress, or physical violence. *Compare* 18 U.S.C. § 1752(a)(1) (2006) *with* 18 U.S.C. § 1752(a) (1970). But Congress did not stop there. In 2012 it reconfigured the statute, adding the term "restricted buildings or grounds" and then defining it under subsection (c), as it appears today. 18 U.S.C. § 1752(a) (2012). Congress did not take that opportunity to clarify who can or must do the restricting, leaving it open-ended. But Congress did lower the *mens rea* requirement, striking the requirement that a defendant act "willfully."

*Griffin*, 2021 WL 2778557, at *4 (footnote omitted).

The defendant offers nothing new to counter the reasoning in *Griffin* and this Court's prior decision in *McHugh I*.

### B.   The Court Should Deny Sheppard's Motion To Dismiss Counts Two and Three – Which Allege Violations Of 18 U.S.C. § 1752 – Because The Vice President Plainly Can "Temporarily Visit" The U.S. Capitol

As Chief Judge Howell stated "common sense easily resolves" this challenge and "[e]very Judge on this Court * * * to consider these same challenges has rejected these exercises in wordsmithing and fabricating ambiguity, and no persuasive reason is presented here to deviate from this uniform and consistent denial of the arguments raised by defendant." *United States v. Mels*, No. 21-cr-184, ECF 65, at 3 (D.D.C. July 21, 2022).[4]

Counts Two and Three allege violations of Section 1752 of Title 18, which prohibits the unlawful entry into and disruptive or disorderly conduct in a "restricted buildings or grounds."  A

---

[4] See *United States v. McHugh*, No. 21-cr-453, 2022 WL 296304, at *20–21 (D.D.C. Feb. 1, 2022) (Bates, J.); *United States v. Bozell*, No. 21-cr-216, 2022 WL 474144, at *8 (D.D.C. Feb. 16, 2022) (Bates, J.); *United States v. Andries*, No. 21-cr-93, 2022 WL 768684, at *16–17 (D.D.C. Mar. 14, 2022) (Contreras, J.); *United States v. Fischer*, No. 21-cr-234, 2022 Case 1:21-cr-00184-BAH Document 65 Filed 07/21/22 Page 4 of 5 5 WL 782413, at *4–5 (D.D.C. Mar. 15, 2022) (Nichols, J.); *United States v. Puma*, No. 21-cr-454, 2022 WL 823079, at *16–19 (D.D.C. Mar. 19, 2022) (Friedman, J.); *United States v. Bingert*, No. 21-cr-91, 2022 WL 1659163, at *15 (D.D.C. May 25, 2022) (Lamberth, J.); *United States v. Anthony Robert Williams*, No. 21-cr-377, ECF No. 88 (D.D.C. June 8, 2022) (Howell, C.J.); *United States v. Riley Williams*, No. 21-cr-618, 2022 WL 2237301, at *20 (D.D.C. June 22, 2022) (Jackson, J.)

"restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area … where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B). At the time the defendant entered the U.S. Capitol grounds during and in furtherance of the January 6, 2021, attack, the Vice President was present in the Capitol building. Sheppard's conduct accordingly falls within the Section 1752's plain sweep: as alleged in the Indictment, the defendant unlawfully entered and engaged in disorderly or disruptive conduct on restricted ground – *i.e.*, in an area where the Vice President was "temporarily visiting."

Sheppard nonetheless argues that Counts Two and Three fail to state violations of Section 1752 because Vice President Pence's presence at the Capitol on January 6, 2021, does not establish that he was "temporarily visit[ing]" the U.S. Capitol that day.  Mot. 24-26.  He further claims that his is the "commonsense" reading of the statute. *Id.* at 26. Sheppard is wrong. His reading of Section 1752 contravenes the statute's plain terms, structure, and purpose.

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)). As noted, subsection 1752(c)(1)(B) defines "restricted buildings or grounds," in relevant part, as "any posted, cordoned off, or otherwise restricted area … of a building or grounds where the President or other person protected by the Secret Service is or will be *temporarily visiting*." (Emphasis added). In turn, the verb "visit" means, *inter alia*, "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."[5] And the adverb "temporarily" adds that the protectee's visit must occur "during a limited time."[6]

---

[5]     https://www.merriam-webster.com/dictionary/visit (last visited June 21, 2022).
[6]     https://www.merriam-webster.com/dictionary/temporarily (last visited June 21, 2022).

As a textual matter, then, either definition of "visit" plainly describes the Secret Service protectee's activities on January 6.  Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber.  While not specifically alleged in the Indictment, two other Secret Service protectees (members of the Vice President's immediate family) also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings while they were ongoing and Vice President Pence was present.  Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification.  And all three protectees visited the Capitol temporarily – *i.e.*, during a limited time.  Given the nature of the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting," 18 U.S.C. § 1752(c)(1)(B). *See Williams*, No. 1:21-cr-377, ECF 88, at 5-6 (adopting the "plain reading of the words" in subsection 1752(c)(1)(B) urged by the government); *McHugh*, 2022 WL 296304, at *21 (reaching "a commonsense conclusion: the Vice President was 'temporarily visiting' the Capitol"); *Andries*, 2022 WL 768684, at *16 ("Vice President Pence was 'temporarily visiting' the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only. Plainly he did. He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral count proceeding; he intended to and did stay there only for a limited time."); *Puma*, 2022 WL 823079, at *17 (under the plain language of Section 1752, the Vice President "was temporarily visiting the Capitol on January 6, 2021: he was there for a limited time only in order to preside over and participate in the Electoral College vote certification.").

Sheppard's contrary contentions lack merit. First, Sheppard insists that the phrase "temporarily visiting" means "temporary travel to a location where the person does not normally live or work on a regular basis" – a carveout that, in Sheppard's view, is dispositive here because "he actually worked at the Capitol Building and grounds—it was his place of employment." Mot. 25. But Chief Judge Howell rejected this argument in *Mels*, and for good reason. "Despite having a limited role as President of, and tiebreaker for, the Senate . . . the Vice President is generally regarded as an executive branch officer, and generally works in locations other than the Capitol." *Mels*, No. 21-cr-377, ECF 65, at 3 (citing U.S. Const. art. I, § 3, cl. 4 and art. II, § 1, cl. 1). Moreover, "a government official can clearly appear somewhere temporarily and still be doing official work in the process." *Id.* It follows from these uncontroversial principles that "the Vice President's presence for official duties by presiding over a session of Congress" on January 6 did not "make him any less of a temporary visitor" at the Capitol on that day. *Ibid.*

Second, Sheppard observes that the Vice President "[i]n his official capacity as the 'President of the Senate,' [] had a permanent office 'within the United States Capitol and its grounds.'" Mot. 25. That is true but irrelevant. Section 1752(c)(1)(B) defines the restricted area by reference to the location of the protectee, not the location of his or her physical offices. When Vice President Pence traveled to the U.S. Capitol on January 6 to oversee the Joint Session of Congress, he was "visiting" the building. And because Vice President Pence intended to leave at the close of the session, this visit was "temporar[y]." Or, as Chief Judge Howell put it in *Mels*, "[t]he fact that the Vice President has a space set aside in the Capitol for occasional use – notably, not the location where Vice President Pence was working inside the Capitol on January 6, 2021 – makes this official no less a 'visitor' and no less 'temporary' when making an appearance on the premises of the Capitol." *Mels*, No. 21-cr-184, ECF 65, at 3.

Third, Sheppard cites cases where either the President or Vice President were "traveling outside of the District of Columbia 'visiting' that area for a 'temporary' purpose." (ECF 67:11 (citing *United States v. Bursey,* 416 F.3d 301 (4th Cir. 2005) (airport hangar); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (unpublished) (park)).  But Chief Judge Howell's ruling in *Mels* correctly rejected that argument as well: "the fact that those situations clearly qualify does not mean that the relevant situation on January 6 cannot count as well." No. 21-cr-184, ECF 65, at 3.

### III.   Count Six of the Indictment sets forth all the elements of 5104(e)(2)(G), is neither overbroad nor unconstitutionally vague, and put Sheppard on notice.

Sheppard advances three arguments in support of his motion to dismiss Section 5104(e)(2)(G): (1) the statute is "substantially overbroad" (Mot. 27-30); (2) the statute is "unconstitutionally vague on its face" (Mot. 30-33); and (3) that Count 6, which charges a violation of Section 5104(e)(2)(G), fails to state an offense and put "ordinary people on notice" of prohibited conduct (Mot. 33).  None of those arguments has merit, and this Court previously rejected them in *United States v. Nassif*, 2022 WL 4130841 (Sept. 12, 2022).

### A.   Section 5104(e)(2)(G) is not constitutionally overbroad.

In the First Amendment context, as in others, "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008).  Facial overbreadth challenges—in which a defendant asserts that a statute, constitutionally applied to her, is nevertheless invalid because it would be unconstitutional in a "substantial number" of *other* cases, *id.* at 449 n.6 (internal quotation marks omitted)—are even more exceptional.  "'Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment,'" overbreadth is "'"strong medicine"'" to be employed "'"only as a last resort."'"  *Los Angeles Police Dep't v. United Reporting Publ'g*

*Corp.*, 528 U.S. 32, 39 (1999) (quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)); *cf.*
*Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the
overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected
conduct") (emphasis omitted).

The Supreme Court has therefore "vigorously enforced the requirement that a statute's
overbreadth be *substantial* . . . relative to the statute's plainly legitimate sweep." *United States v.*
*Williams*, 553 U.S. 285, 292 (2008). "[T]he mere fact that one can conceive of some impermissible
applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."
*Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, "there
must be a realistic danger that the statute itself will significantly compromise recognized First
Amendment protections of parties not before the Court." *Id.* at 801. And laws that are "not
specifically addressed to speech" are far less likely to present such a danger. *Hicks*, 539 U.S. at
124; see *id.* (observing that "an overbreadth challenge" to such a law will "[r]arely, if ever, . . .
succeed").

Shepphard's challenge fails that demanding standard. Because "it is impossible to
determine whether a statute reaches too far without first knowing what the statute covers," the
"first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*,
553 U.S. at 293. The prohibition in Section 5104(e)(2)(G) presents "no ambiguity"; it "tells the
citizen that it is unlawful for him" to parade, demonstrate, or picket inside the Capitol Building.
*Jeanette Rankin Brigade*, 342 F.Supp. at 583. The operative verbs—parade, demonstrate, and
picket—principally target conduct rather than speech, and those verbs are paired with the
"willfully and knowingly" scienter requirements, *see Williams*, 553 U.S. at 294 (focusing on
scienter requirement in determining that statute was not overbroad). At the very least, Sheppard

cannot show that § 5104(e)(2)(G) is "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted). Sheppard's own prosecution—which involved physically trespassing into the restricted Capitol and confronting officers guarding the entrance to the Speaker's Lobby—is illustrative of the numerous constitutionally legitimate applications of the statute to conduct and unprotected speech. As this Court previously found, "the plain text of § 5104(e)(2)(G), which applies to narrower conduct only in the nonpublic forum of the Capitol building, is not unconstitutionally overbroad on its face." *United States v. Nassif*, 2022 WL 4130841 *6 (Sept. 12, 2022).

And far from showing a "realistic danger" of constitutionally problematic applications in other cases, *Taxpayers for Vincent*, 466 U.S. at 801, Sheppard fails to identify a single actual example of a prosecution based on protected speech. The limitations inherent in the crime of conviction, moreover, render the possibility of any such prosecutions marginal at best, and any such case could be the subject of an as-applied challenge. Nothing at all calls for the "strong medicine," *Los Angeles Police Dep't*, 528 U.S. at 39 (internal quotation marks omitted), of overbreadth invalidation.

Sheppard's counterarguments lack merit. First, he relies (Mot. 28-29) on *Bynum v. U.S. Capitol Police Bd.* 93 F.Supp.2d 50, 53 (D.D.C. 2000), where Judge Friedman ruled that a Capitol Police regulation interpreting Section 5104(e)(2)(G)[7] that defined "demonstration activity" to include "holding vigils" and "sit-ins" swept too broadly because it "invited the Capitol Police to restrict behavior that is no way disruptive." 93 F. Supp. 2d at 53, 57. As an initial matter, *Bynum*'s invalidation of a Capitol Police regulation—which was applied to an individual who was denied permission to pray inside the Capitol building—does not inform the statutory challenge that

---

[7] At the time, the provision was Section 193(f)(b)(7).

Sheppard presses here.[8]   Moreover, Judge Friedman in *Bynum* concluded that the inside of the Capitol building is a nonpublic forum, where the government may restrict First Amendment activity if "the restrictions are 'viewpoint neutral' and 'reasonable in light of the purpose served by the forum.'"   *Id.* at 56 (citing *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 806 (1985)).   He reasoned that, although the regulation went too far, Section 5104(e)(2)(G) itself set forth "legitimate purposes," *id.* at 57, that were "aimed at controlling only such conduct that would disrupt the orderly business of Congress—not activities such as quiet praying, accompanied by bowed heads and folded hands," *id.* at 58.[9]   In short, Judge Friedman concluded that, unlike the regulation at issue in *Bynum*, the statute itself was not "substantial[ly] overbroad relative to its "plainly legitimate sweep."   *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted).   *See United States v. Nassif*, 2022 WL 4130841 *5 (Sept. 12, 2022) ("Given the permissive standard applicable to nonpublic forums, it is reasonable for the Congress to conclude that its interest in peaceful lawmaking requires a limitation on the demonstrative activities of non-legislators.").

Sheppard's reliance (Mot. 29-30) on *Lederman v. United States*, 89 F. Supp. 2d 29 (D.D.C. 2000), is also unavailing.   Like *Bynum*, *Lederman* involved a challenge to a Capitol Police regulation, and is of marginal, if any, relevance for that reason.   Furthermore, the regulation at issue there limited the areas within the Capitol *Grounds* in which individuals could engage in

---

[8] Similarly inapposite here is Sheppard's invocation (Mot. 29 and n.15) of a current Capitol Police regulation.   Sheppard does not—and could not—challenge that regulation in this case.

[9] Sheppard suggests (Mot. 27-28) that the legislative debate over what became Section 5104(e)(2)(G) undercuts Judge Friedman's interpretation that the statute was designed to prevent conduct that disrupted congressional business.   Even putting aside the limited value of legislative history (*see infra* at p. 44) on this point, Sheppard confuses congressional debate about whether to add an additional intent requirement to the existing "willfully and knowingly" scienter in the statute with the actus-reus question—what type of conduct does "demonstrate" in Section 5104(e)(2)(G) encompass—at issue in *Bynum*.

"demonstration activity," which in *Lederman* involved the distribution of leaflets in support of the arts. *Id.* at 32. Relying in part on *Jeanette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D.D.C. 1972), Judge Roberts in *Lederman* concluded that the entire Capitol Grounds constitute a traditional public forum, *id.* at 37, and that although the regulation left open alternative channels for expression, its imposition of a total ban burdened more speech than necessary. *Id.* at 38-39. The hypothetical "group of congressional staffers" whose conduct would violate the regulation (and who Sheppard cites (Mot. 30)) "stood outside the Capitol," and thus "within a traditional public forum." *Id.* at 41. But Section 5104(e)(2)(G)'s prohibition applies only within the nonpublic forum inside the Capitol buildings, rendering the hypothetical inapt.

Finally, Sheppard adverts at various points to statements during the House debate on the statute. But legislative history "is an uneven tool that cannot be used to contravene plain text." *United States v. Bingert*, 21-cr-91, 2022 WL 1659163, at \*11 (May 25, 2022) (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)). The floor statements on which Sheppard relies are "particularly 'unreliable.'" *United States v. Powell*, 21-cr-179, ECF No. 73, at 6 (D.D.C. July 8, 2022) (citing *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474 (1921)). For example, in at least one instance, Sheppard's citation to the legislative history is misleading. He accurately quotes (Mot. 27) Representative O'Neal's statement that O'Neal is "a little bit disturbed" about the language of the predecessor to Section 5104(e)(2)(G), but omits the later discussion in which O'Neal makes clear that the basis for his concern was that the prohibition does not also include the Capitol Grounds. *See* 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. O'Neal) (asking if "anyone would have an objection to adding the word 'grounds' to the new

language"),[10]  In any event, as this Court previously concluded, "the plain text of § 5104(e)(2)(G),

which applies to narrower conduct only in the nonpublic forum of the Capitol building, is not

unconstitutionally overbroad on its face."  *Nassif*, 2022 WL 4130841 at *6.

## B.   Section 5104(e)(2)(G) is not unconstitutionally vague.

Sheppard next contends (Mot. 30-33) that Section 5104(e)(2)(G) is "unconstitutionally

vague on its face."  *Id.* at 7.[11]  That contention is flawed.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government

from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const.

amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine

prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people

fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement."

*Johnson v. United States*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a

legislature need do nothing more than enact and publish the law, and afford the citizenry a

reasonable opportunity to familiarize itself with its terms and to comply.'"  *United States v.*

*Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532

---

[10] Other representatives clarified that the law enacted in 1946 already included a similar prohibition that applied to the Capitol Grounds.  *See* 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. Colmer) (noting that such an addition "would be surplusage").

[11] Sheppard thus asserts a facial vagueness challenge.  As a general matter, one making such a facial vagueness challenge must demonstrate that the law is "impermissibly vague in all its applications"; one whose conduct is "clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests.*, 455 U.S. 489, 494-95 (1982).  Sheppard cannot surmount that demanding standard.  Where the facial challenge relies on a First Amendment theory, a facial challenge may be available where the challenger shows that the law in question "reaches a substantial amount of constitutionally protected conduct."  *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) (citing *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983)).  Even assuming that is viable theory under governing law, *see Quigley v. Giblin*, 569 F.3d 449, 457-58 (D.C. Cir. 2009) (questioning the breadth of "First Amendment vagueness doctrine"), Sheppard's facial vagueness claim fails for the same reasons that his overbreadth challenge falls short.

(1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *Williams*, 553 U.S. at 306, or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)).  Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)).  A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). "As a general matter," however, a law is not constitutionally vague where it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

Sheppard fails to overcome the strong presumption that Section 5104(e)(2)(G) passes constitutional muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").  Section 5104(e)(2)(G) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604.  Section 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306.  The statute requires that a defendant, acting willfully and knowingly, parades, pickets, or demonstrates—in short, engages in disruptive conduct—inside the Capitol building.  "Section 5104(e)(2)(G) requires that an individual willfully and knowingly parade, picket, or demonstrate inside the Capitol building.  This language provides sufficient guidance as to what is prohibited." *Nassif*, 2022 WL 4130841 at *7.  *See Bynum*, 93 F. Supp. 2d at 57-58 (explaining that Capitol Police regulation at issue in that case was unnecessary because Congress had provided "more than sufficient guidance" in Section 5104(e)(2)(G)'s statutory text).  While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary

human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).[12]

### C.    Count Six states an offense.

Finally, Sheppard argues (Mot. 33) that Count Six, which charges a violation of Section 5104(e)(2)(G), fails to state an offense.  That argument fails.

A charging document is sufficient under the Constitution and Federal Rule of Criminal Procedure 7 if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished by "echo[ing] the operative statutory text while also specifying the time and place of the offense," *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.'"  *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).  And a charging document need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Count Six's allegations "clear[] th[e] low bar," *see United States v. Sargent*, No. 21-cr-258, 2022 WL 1124817, at *1 (D.D.C. Apr. 14, 2022) (Hogan, J.), to sufficiently plead a violation of Section 5104(e)(2)(G).  First, Count Six includes the element of Section 5104(e)(2)(G): it alleges that Sheppard engaged in the prohibited conduct (parading, demonstrating, and picketing in a Capitol Building) and did so with the requisite mental state (willfully and knowingly).  Count

---

[12] For the reasons given above, *see supra* note 9, Sheppard's reliance on scattered comments during the floor debate in the House does not counsel a different outcome.

Six further alleges that the offense was committed on or about a specific date (January 6, 2021), and that the offense was committed in a specific district (the District of Columbia).

Although some cases involve a crime "that must be charged with greater specificity," *United States v. Resendiz-Ponce*, 549 U.S. 102, 109 (2007), this is not one of them. The paradigmatic example comes from *Russell v. United States*, 369 U.S. 759 (1962), where the defendant was charged under a statute that makes it a crime for a witness called before a congressional committee to refuse to answer any question "pertinent to the question under inquiry." 2 U.S.C. § 192. The indictment's failure in *Russell* to identify the subject of the congressional hearing rendered it insufficient because "guilt" under that statute "depend[ed] so crucially upon such a specific identification of fact." *Russell*, 369 U.S. at 764. That feature is not present here because guilt under Section 5104(e)(2)(G)—or under any of the other charges that the defendant here faces—does not depend on any such "specific identification of fact." *See Resendiz-Ponce*, 549 U.S. at 110 (not applying *Russell* to the illegal re-entry statute at issue in that case because guilt did not turn upon "a specific identification of fact"); *Williamson*, 903 F.3d at 131 (not applying *Russell* to statute criminalizing threats against federal officers); *see also United States v. Apodaca*, 275 F. Supp. 3d 123, 153 n.17, 154-56 (D.D.C. 2017) (not applying *Russell* to statute criminalizing use of firearms in connection with drug trafficking crimes).

Rather than dispute this straightforward analysis, Sheppard (Mot. 33) contends that Section 5104(e)(2)(G) offers "no clarity or specificity as to what is meant by parading, picketing, or demonstrating" and so "fails to put ordinary people on notice of what is prohibited." As this Court observed, however, the "definition of demonstrate . . . it is clear that § 5104(e)(2)(G) prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint." *Nassif*, 2022 WL 4130841 at *6. Sheppard's contention is flawed for the reasons given above, but in any

event, is not relevant to determine whether Count Six satisfies the standard set out in Rule 7. Simply put, Count Six provides a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Nothing else is needed.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that Defendant Sheppard's motion to dismiss be denied in its entirety.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Craig Estes
          CRAIG ESTES
          Assistant United States Attorney
          United States Attorney's Office for the
          District of Columbia
          Massachusetts Bar No. 670370
          craig.estes@usdoj.gov
          (617) 748-3100


          /s/ Sonia Mittal
          SONIA MITTAL
          Assistant United States Attorney
          United States Attorney's Office for the
          District of Columbia
          Illinois Bar No. 6314706
          sonia.mittal@usdoj.gov
          (202) 821-9470

</div>