UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :

    v.    :    21-CR-203 (JDB)

ALEXANDER SHEPPARD    :

**OBJECTIONS TO DRAFT PRESENTENCE REPORT**

Mr. Sheppard, through undersigned counsel, submits the following objections to the Draft Presentence Report ("PSR") filed on March 28, 2023. *See* ECF No. 92.

## INTRODUCTION

The pre-sentence report in this case is deficient in numerous respects. It essentially adopts the government's recitation of events without conducting its own independent investigation regarding the evidence adduced at trial. It makes no attempt to be an objective review despite the defense providing probation with trial transcripts.

## DISCUSSION

### I. Defense objection to Offense Conduct Summary

Beginning on paragraph 15 of the PSR, probation acknowledges it is only providing the Government's account of the facts presented at trial – despite the availability of trial transcripts.[1] This government account laid out by the PSR in paragraphs 16-27 is taken and copied verbatim from an off the record document sent by the government to probation via email on March 6, 2023 where it summarized its opinion of the version of events as well as its calculation of the sentencing guidelines. Mr. Sheppard requests that the PSR reflect the actual testimony adduced at trial rather than the government's *opinion* summary of events. Based on the actual testimony at trial, Mr. Sheppard requests that the following information be included in the offense conduct section of the PSR and that probation reject the government's opinions about the testimony adduced.

---

[1] Defense counsel also provided probation with a copy of Mr. Sheppard's testimony in the hope that probation would include it in its analysis in determining the appropriate guideline range.

2

Mr. Sheppard traveled from Ohio to Washington, D.C. the night of January 5, 2021. On the way to D.C., Mr. Sheppard messaged his friend, Tiller Robinson, that he was "on his way to D.C. to protest the election." *See* Trial Transcript, Day 4 at 49. Mr. Sheppard also recorded a video of himself proclaiming his intentions to protest what he believed was a fraudulent election. *Id*. at 49-50, 77. (*see* gov. admitted exhibit 321). On January 6, 2021, Alexander Sheppard attended the "Stop the Steal Rally," where he heard the former President Donald Trump tell the crowd that they needed to go down to the Capitol building to protest in order to encourage Mike Pence and Senators to vote to send back the votes to the states. *Id*. at 79-81 (*see* def. admitted exhibit 1). On that day, he was wearing a blue hooded sweatshirt and a red Make America Great Again Hat. *See* Trial Transcript, Day 3 at 191.

Captain Sean Patton testified that the breach of the Peace Circle on the west side of the Capitol building occurred at 12:53 p.m. *Id*. at 57-60. At about 1:54 p.m., Mr. Sheppard walked towards the Capitol building and the Peace Circle. *Id*. at 70-71. Mr. Sheppard testified that he decided to walk to the Capitol building because "President Trump said to march towards the Capitol." *See* Trial Transcript, Day 4 at 81. He also explained he had a backpack with a water bottle and some granola bars. *Id*. at 82. Mr. Sheppard testified that when he arrived on the Capitol grounds, he did not see any bike barricades, signs indicating a restricted area, or any fencing. *Id*. at 83. Mr. Sheppard did explain that while on the grounds, he remembers it was very loud and there was a lot of people chanting, and observed scaffolding. *Id*. at 84-

3

85. He then further testified that he walked up stairs from the scaffolding and admitted to entering the Capitol building. *Id*. at 86.

Captain Patton testified that Mr. Sheppard (a man with a red hat and blue hoodie) entered the Senate Wing Door of the Capitol Building at approximately 2:15 p.m. through doors that had previously been breached. *See* Trial Transcript, Day 3 at 198. Captain Patton also testified that when traveled to that location shortly after this time, he observed broken glass and heard alarms going off. *Id*. at 202-203.

Mr. Sheppard testified that as he walked into the Capitol building, he walked through an open door, but did not see any broken glass or anyone climbing through windows, did not hear alarms going off in the background (explaining his hearing is impaired), and did not see any police officers upon entry. *See* Trial Transcript, Day 4 at 86-89. However, he did hear a lot of people yelling and explained it was "very loud and very chaotic." *Id*. at 89.

Mr. Sheppard then headed to the Crypt area of the Capitol building where he joined another crowd who he joined in chanting "USA!" *Id. See also* Trial Transcript, Day 2 at 200-201. Mr. Sheppard explained that he did see police forming a line in the Crypt but that he believed their presence was to intended to maintain order and make sure things did not get violent. *See* Trial Transcript, Day 4 at 90-91. Mr. Sheppard never spoke to officers and they did not speak to him. *Id*. Shortly after, the crowd in front of him and behind him pushed forward and moved past police forcing Mr. Sheppard to move with them, however he did not make contact with any officers. *Id*. at 91-93.

4

Mr. Sheppard then followed the crowd through the House connecting corridor He explained he did not know where he was going and was traveling in the direction of those in front of him. *Id*. at 95-96 (*see* gov. exhibit 409A), *see also* Trial Transcript, Day 3 at 13-14. He then moved through the Statutory Hall, staying within the designated ropes that were not disheveled or moved at that time. *Id*. at 97 (see gov. exhibit 412), *see also* Trial Transcript, Day 3 at 27-28.

Mr. Sheppard then followed the crowd and directions of other rioters at times chanting the same phrases (such as "Stop the Steal"!). At one point, Mr. Sheppard videoed himself saying, "We shut down Congress," and referred to the politicians implying that they did so because they were "too scared." *Id*. at 99-100. Mr. Sheppard explained that he videoed himself saying these things after hearing from the crowd around him that they shut down Congress. *Id*. He also explained that he believed the politicians were scared of the political consequences of not sending the votes back to the states but never intended members of Congress to be physically scared for their lives. *Id*. at 100.

Mr. Sheppard lastly ended up right outside the House Chambers behind the door to the Speaker's Lobby. *See* Trial Transcript, Day 3 at 44. Mr. Sheppard followed people there who were waving him in that direction but did not know what they were doing or who they were. *See* Trial Transcript, Day 4 at 102-104. Mr. Sheppard also did not know what part of the building he was in. *Id*. at 103. Mr. Sheppard then acknowledged that while outside the Speaker's Lobby, he engaged in inappropriate rhetoric towards police officers and acted in a disorderly manner. *Id*.

5

at 105. Mr. Sheppard then explained that as he was filming with his phone, he realized the glass of the door was being broken, but never encouraged anyone to break glass. *Id*. at 106-107. Mr. Sheppard acknowledged that he shouted things towards police like, "We supported you guys, BLM and Antifa were killing cops", and, "we are taking our country back!." *Id*. at 108-110. Mr. Sheppard, however, started to back up when he observed someone trying to kick down the door. *Id*. at 111 (*see* gov. exhibit 511). After hearing a gun shot and realizing a young lady had been shot, Mr. Sheppard became afraid and went into shock. *Id*. at 112. He continued to back up and shortly after officers escorted him outside of the building. *Id*.

After leaving the Capitol building, Mr. Sheppard got into his car and left the city. *Id*. at 113. Following January 6, 2021, Mr. Sheppard lied to his parents and a friend, telling them he did not go inside the building –realizing the extent of what he was just involved in. *Id*. at 114, 119. On January 9, 2021, before Mr. Sheppard learned of the violence that occurred that on J6, he posted unfortunate comments about being fine with Mike Pence being harmed but not out of a desire that he be harmed but out of frustration that he did not send the votes back to the states. *Id*. at 116-117.

## II. Defense objections to PSR application of U.S.S.G. §3C1.1

Mr. Sheppard objects to the PSR's adjustment for its incorrect belief that he willfully obstructed or impeded the administration of justice by providing false or misleading testimony during trial. *See* PSR, Par. 29-30. Again, probation relies

6

solely on the government's off the record opinion paper regarding Mr. Sheppard's trial testimony when applying this enhancement and providing just the government's opinion as reasons for doing it.

The Sentencing Guidelines make clear that this adjustment is not intended to punish a defendant for the exercise of a constitutional right. *See* §3C1.1, comment. (n. 2). In scenarios where the defendant testifies at trial, the Sentencing Commission directs the Court to "be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." *Id*. Furthermore, this adjustment only applies if the Court determines that Mr. Sheppard provided *materially* false information, which is defined as "information that if believed, would tend to influence or affect the issue under determination." *Id*. at comment. (n.6).

The PSR, in applying this adjustment, is solely punishing Mr. Sheppard for exercising his constitutional right to testify. Mr. Sheppard did not provide materially false information but rather acknowledged his conduct and did not deny the material evidence in this case. In fact, Mr. Sheppard admitted much of the offense conduct and provided explanations for his *mens rea* at the time. He admitted to entering the Capitol building and even acknowledged that he should have known better. *See* Trial Transcript, Day 4 at 86. Mr. Sheppard also explained that "I should have known and I shouldn't have walked in." *Id*. at 89. He again testified that while in the Crypt, he should have known better and was not thinking at the

7

time. *Id*. at 93. Mr. Sheppard then acknowledged all of his movements and actions while inside the Capitol building and even explained that his actions were "stupid" and "inappropriate," and "disorderly." *Id*. at 94, 105.

The PSR's explanation for why it believes Mr. Sheppard's testimony was materially false (based on the verbatim government opinion) is that when asked about his intent on cross-examination, that he provided explanations for his intentions behind certain statements he made and what he observed while entering the building. Presumably, the government's opinion is based on its own theory that these explanations are not plausible. However, that is not a basis for which to claim that his statements were false. Mr. Sheppard did not deny his actions or conduct.

Even on cross examination, Mr. Sheppard admitted to his actions and tried his best to answer the government's questions while the government was essentially mocking him and being extremely combative. Mr. Sheppard admitted that while on the Capitol grounds, that while he did not see police officers tear gassing the crowd that he felt something that felt like pepper spray in the air. *Id*. at 166. Mr. Sheppard admitted to entering the building and while he acknowledged that the windows in the videos being shown to him appeared to be damaged, that at the time he did not notice it. *Id*. at 174. Mr. Sheppard further acknowledged it was not a normal situation when he walked in, hearing a lot of noise and chaos. *Id*. at 176.

Later in the cross-examination, Mr. Sheppard admitted he was part of a group that pushed past a police line. *Id*. at 179. Mr. Sheppard then admitted he was chanting loudly in the building and that in hindsight his conduct was disruptive. *Id*.

8

at 187-197. Even when the government was essentially testifying (court acknowledging at *Id*. at 213), Mr. Sheppard did his best to navigate the loaded and aggressive questions being asked.

Mr. Sheppard did not make any inconsistent statements and simply explained what he was thinking at the time of his conduct. The PSR incorrectly deems Mr. Sheppard's testimony to be obstructive only because the government suggests it is so. It is difficult to imagine what kind of defendant testimony would not be deemed to be obstructive based on the government's analysis. Mr. Sheppard exercised his constitutional right to testify about what he observed and what he was thinking. That should not be held against him because the government thinks his explanations about what was going on in his own mind were not plausible. For these reasons, Mr. Sheppard requests that the PSR remove this adjustment.

### III. Defense objection to PSR application of U.S.S.G. §2J1.2(b)(2)

The PSR added 3 levels to Mr. Sheppard's total offense level under U.S.S.G. §2J1.2(b)(2), which requires that the offense result in "substantial interference with the administration of justice." For the reasons set forth in the Honorable Judge McFadden's opinion on this issue[2], the application of these enhancements is a legal error and factual error. The guidelines application note states that "substantial interference with the administration of justice" includes:

> [A] premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure

---

[2] Rather than summarizing Judge McFadden's reasoning, undersigned counsel has attached Judge McFadden's Order as Exhibit 1 and incorporates it by reference.

9

of substantial governmental or court resources.

U.S.S.G. §2J1 cmt. n. 1.

Courts do not interpret the guidelines in a manner different from their interpretation of statutory text. *E.g.*, *United States v. Martinez*, 870 F.3d 870 F.3d 1163, 1166 (9th Cir. 2017) ("We interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation."). Thus, the proper inquiry into meaning "will most often begin and end with the text and structure of the Guidelines." *Id.* "The language of the Sentencing Guidelines, like the language of a statute, must be given its plain and ordinary meaning." *United States v. Fulford*, 662 F.3d 1174, 1177 (11th Cir. 2011). Therefore, courts' construction of the phrase "administration of justice" as it appears in Title 18 should not differ from their interpretation of the same phrase in the guidelines. *Id.*

Here, there is no real debate. Every circuit that has addressed the question has held that the phrase "administration of justice" refers to judicial proceedings. *United States v. Richardson*, 676 F.3d 491, 502-503 (5th Cir. 2012) ("[O]bstructing the due administration of justice means interfering with the procedure of a judicial hearing or trial."); *United States v. Brenson*, 104 F.3d 1267, 1279-80 (11th Cir. 1997) ("due administration of justice" means "judicial procedure" and "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving thoughtful testimony when subpoenaed"); *United States v. Warlick*, 742 F.2d 113, 116 (4th Cir. 1984) (defining obstruction of the "administration of justice" as acts that "thwart the judicial process"); *United States v. Rasheed*, 663 F.2d 843, 851 (9th Cir.

10

1981) ("administration of justice" commences with "a specific judicial proceeding").

The aforementioned application note to U.S.S.G. §2J1.2(b) bolsters that commonsense reading. Every example of substantial interference with the "administration of justice" involves interference with an investigation or evidence. U.S.S.G. §2J1 comment. n. 1.

Text aside, law-of-the-case and estoppel principles foreclose application of these specific offense characteristics. As the Court knows, January 6 defendants have filed dozens of motions to dismiss the § 1512(c)(2) charge and in front of every judge of this Court. One of their arguments was that Congress's joint session to count electoral votes does not constitute an "official proceeding" under that statute because, among other reasons, it did not involve the administration of justice. In response, the government contended that the joint session did not need to entail the administration of justice to constitute an "official proceeding." And in dozens of filings the government all but conceded, that, in fact, the joint session did not administer justice. *see United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021), p. 8 n. 3 (government: "the certification of the Electoral College vote is not an 'inquiry or investigation'"); *United States v. Knowlton*, 21-cr-46, ECF No. 63 (D.D.C. 2021), p. 12 (government: "The 'proceeding before Congress' is not limited to proceedings solely related to the administration of justice."); *United States v. Nordean,* 21-cr-175, ECF No. 106 (D.D.C. 2021), p. 21 (government acknowledging that although § 1512(c)(2) had "never been applied" outside the context of the administration of justice, the "unprecedently brazen attack" on the Capitol justified application outside that

11

context). The government's arguments on this score led the Court to positively hold that the joint session *does not administer justice. United States v. Montgomery*, 578 F. Supp. 3d 54 (D.D.C. 2021) ("Congress does not engage in . . . 'the administration of justice.'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 24 (D.D.C. 2021) ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding.'").

Having denied defendants' dismissal motions that argued the joint session needed to, but did not, administer justice, the Court cannot find, under the same tools of interpretation, that "administration of justice" now means something different under the Guidelines. Under the law- of-the-case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Carr*, 557 F.3d 93, 101 (2d Cir. 2009). The doctrine is "driven by considerations of fairness to the parties, judicial economy, and the societal interest in finality." *Id.*

Indeed, it would be contrary to due process as well nonsensical to assume that the Sentencing Commission meant to include "official proceeding" though it did not include the phrase in Section 2J1.1. As indicated, the Guidelines are interpreted using the same tools of construction that are employed in the interpretation of statutory text. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. The government and the defense alike cannot read words into the guidelines that the Commission did not include. Especially here, where reading words into the guideline results in a 3-level increase in the guideline range, which translates into *months* of a defendant's

liberty.

Finally, it would be nonsensical to interpret "administration of justice" one way under the Guidelines and a different way in Title 18. It is not just that the interpretive tools are the same. *Martinez*, 870 F.3d at 1166; *Fulford*, 662 F.3d at 1177. It is that §2J1.2 was designed to sentence offenses under § 1503. U.S.S.G. §2J1.2 cmt Statutory Provisions. Section 1503 contains the exact same phrase, "administration of justice." § 1503. Administratively, it would be chaotic for the phrases to hold different meaning.

Lastly, the government appears to be seeking this offense characteristic in every § 1512(c)(2) case without regard to factual differences. The common thread linking the examples of "substantial interference" with the administration of justice in the relevant application note is acts that materially affect the *outcome* of the obstructed proceeding; for example, a prematurely terminated investigation or indictment procured through perjury. U.S.S.G. §2J1 comment. (n.1). Here, Mr. Sheppard's actions had no causal relationship with the outcome or duration of the joint session. He assaulted no one and he did not encounter legislators or staff. He did not step foot in the Senate Chamber when Congress was meeting or at all. His conduct was similar to that of Class A and B misdemeanants who entered the building and engaged in disorderly conduct. There is no factual basis for calling Mr. Sheppard's conduct "substantially" obstructive unless the court is prepared to conclude that every protester who entered the building committed obstruction of justice.

## IV. Defense objection to PSR refusal to apply any acceptance of responsibility adjustment under U.S.S.G. §3E1.1

The PSR did not include any points for acceptance of responsibility noting simply that the defendant went to trial was convicted. *See* PSR at Par. 31. However, the PSR failed to consider the extent of which Mr. Sheppard actually accepted responsibility through his testimony at trial. As initial matter, there are many factors under U.S.S.G. §3E1.1 to consider when determining if a defendant accepts responsibility for the offense. While comment. (n.2) explains that those who go to trial do not ordinarily receive this adjustment, there are rare situations where the court can use its discretion to determine the reasons why a defendant chose to have that trial – including to preserve legal issues.

Mr. Sheppard proceeded to trial because despite several efforts at obtaining a plea offer, the government insisted that he plead guilty to not only the most serious charge in the indictment (18 U.S.C. §1512(c)(2)) but also a charge that is currently being challenged as being inapplicable to the offense conduct.[3] The Court is well aware of this litigation, especially because Mr. Sheppard filed a motion to dismiss for the same reasons prior to trial. Mr. Sheppard was even willing to enter a guilty

---

[3] On April 7, 2023, the D.C. Circuit issued an opinion that ultimately disagreed with the defense in *U.S. v. Fischer*, 22-3038 (D.C. Cir. 2023). However, the defense will likely request rehearing given the fractured opinion and that decision will likely be appealed to the Supreme Court.

14

plea to a felony civil disorder pursuant to 18 U.S.C. §231 – yet the government was still insistent on him pleading guilty to Obstruction of an Official Proceeding.

Despite Mr. Sheppard exercising his right to maintain innocence on all charges, he essentially conceded every charge except for 18 U.S.C. §1512(c)(2). He testified multiple times that he regretted going into the Capitol building and that his actions were stupid, disruptive, foolish, and inappropriate. *See* Trial Transcript, Day 4 at 105, 117, 207, 211. When asked by counsel what he was thinking while in the building, Mr. Sheppard responded:

> At this point I think I was riled up with the crowd, which is why I was, you know, shouting inappropriately. Again, now, you know, seeing everything and looking back at it, I can tell that, you know, just my presence there did make the officers' job more difficult.

*Id*. at 108. Even on cross-examination, while Mr. Sheppard was explaining the context of some of his statements, he said, "But it was again, I did it in, you know, in an angry mob fashion, inappropriate fashion, just, you know, a disorderly fashion." *Id*. at 221.

The only point that Mr. Sheppard disagreed with was his intention of going into the building in the first place – that he did not have the *corrupt* intent to obstruct the official proceeding. Whether or not Mr. Sheppard acted corruptly is one of the issues that he litigated pre-trial and this definition will continue to be disputed for quite some time on appeal. So while Mr. Sheppard chose to exercise his constitutional right to have a jury trial – he did so only to challenge a legal issue and the applicability of the Obstruction statute with respect to his conduct.

For these reasons, Mr. Sheppard should receive a 2 level adjustment for acceptance of responsibility.

V.     **Defense objection to Restitution**

The PSR incorrectly suggests that restitution is mandatory in this case. *See* PSR at Par. 120. However, 18 U.S.C. § 3663A does not mandate restitution for the offense conduct in this case because none of the charges that Mr. Sheppard was convicted of is in the delineated listed offenses in subsection (c).

The PSR and the government argue that other January 6 defendants have been agreeing to $2,000 in restitution pursuant to government plea offers. While that is correct, it is not because restitution is mandatory but rather defendants are agreeing to pay restitution pursuant to 18 U.S.C. § 3663A(a)(3), which allows the Court to order restitution for other types of charges/conduct if the parties stipulate in an agreement.

Federal courts may order restitution only when statues authorize restitution. *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). "The loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order." *Hughey v. United States*, 495 U.S. 411, 420 (1990). Restitution as authorized by state is intended to compensate victims only for the losses caused by the conduct underlying the *offense of conviction. Id.* at 417. (emphasis added). The Supreme Court held that the statutes "authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 413. *See also; United States v. Dorcely*, 454 F.3d 366, 377 (D.C. Cir. 2006).

The Mandatory Victim Restitution Act applies only to certain types of crimes, including an offense "in which an identifiable victim has suffered a physical injury or pecuniary loss." 18 USC Section 3663A(c) (1)(B). The term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. 18 U.S.C. § 3663(b)(2).

Mr. Sheppard was convicted of Obstruction, disorderly conduct, and trespass – not of any charges related to harm against property, or harm against another. While there was harm to property that occurred on January 6, 2021, Mr. Sheppard was not the direct or proximate cause of that harm. Mr. Sheppard was also not convicted of conspiracy and there was no evidence to suggest he encouraged others to harm property or others. For these reasons, restitution is not appropriate in this case.



Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/S/_____

Maria N. Jacob
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500

18

JOHN D. BATES, UNITED STATES DISTRICT JUDGE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Docket No.: 0090 1:21CR00203-001 |
| | : | |
| vs. | : | Disclosure Date: **March 28, 2023** |
| | : | |
| **Sheppard, Alexander** | : | |

## PARTIES OBLIGATION AND RESPONSE TO PRESENTENCE REPORT

Pursuant to Fed. Rules of Crim. Proc. Rule 32(f)(1) and (2), the parties shall submit any material inaccuracies or disputes to the presentence investigation report (PSR), by **April 11, 2023** This form and/or objections to the PSR shall be filed via CM/ECF.

Note: The probation office never includes information about 18 USC § 3553(e) or USSG § 5K1.1, pursuant to Rule 32(c)(3).

### For the Government

(CHECK APPROPRIATE BOX)

    ( )    There are no material/factual inaccuracies therein.

    ( )    There are material/factual inaccuracies in the PSR.

### For the Defendant

(CHECK APPROPRIATE BOX)

    ( )    There are no material/factual inaccuracies therein.

    (X)    There are material/factual inaccuracies in the PSR.

### Restrictions on Use and Redisclosure of Presentence Report

The presentence investigation report and this form are not public documents.

It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the presentence investigation report is prohibited without the consent of the sentencing judge.